UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UPSTREAM RENEWABLE DEV II LLC and RENEWABLE SDIRA LLC,<br><br>                    Plaintiffs,<br><br>          v.<br><br>CABLE RELIABILITY PROJECT HOLDINGS LLC, CLAREMONT RELIABILITY PROJECT HOLDINGS LLC, SANTA FE SPRINGS RELIABILITY PROJECT HOLDINGS LLC, UPLAND RELIABILITY PROJECT HOLDINGS LLC and RANCHO CUCAMONGA RELIABILITY PROJECT HOLDINGS LLC,<br><br>                    Defendants. | Case No. 24-cv-3896<br><br>**COMPLAINT** |

Plaintiffs Upstream Renewable Dev II LLC ("Upstream") and Renewable SDIRA LLC ("SDIRA" and collectively with Upstream, "Plaintiffs"), by and through their undersigned counsel, files this original Complaint against Cable Reliability Project Holdings LLC ("Cable Buyer"), Claremont Reliability Project Holdings LLC ("Claremont Buyer"), Santa Fe Springs Reliability Project Holdings LLC ("SFS Buyer"), Upland Reliability Project Holdings LLC ("Upland Buyer"), and Rancho Cucamonga Reliability Project Holdings LLC ("RC Buyer"), and alleges as follows:

## NATURE OF THE ACTION

1.       Plaintiffs bring this action against Defendants seeking an order, *inter alia*, declaring that the notice of indemnity Defendants served on Plaintiffs on April 22, 2024 (the "Purported Indemnity Notice") was insufficient and therefore unenforceable under the terms of the two Membership Interest Purchase Agreements executed between the parties hereto ("MIPAs").

2.      Plaintiffs also seek an order finding Defendants in anticipatory breach of Sections 2.2.3 and 2.2.4 of one of the Membership Interest Purchase Agreements because Defendants intend to not make required post-closing milestone payments to Plaintiffs.

## PARTIES, JURISDICTION AND VENUE

3.      Upstream is a Delaware limited liability company.  Upstream's sole member is Ryan Hulett.  Ryan Hulett is domiciled in La Jolla, California.  Therefore, Upstream is a citizen of California.

4.      SDIRA is a Delaware limited liability company.  SDIRA's sole member is Ryan Hulett.  Ryan Hulett is domiciled in La Jolla, California.  Therefore, SDIRA is a citizen of California.

5.      Upon information and belief, Cable Buyer is a Delaware limited liability company. GridStor Subsidiary, LLC, a Delaware limited liability company, is the managing member of Cable Buyer.  GridStor, LLC, a Delaware limited liability company, is the sole member of GridStor Subsidiary, LLC.  Chris Taylor is the managing member of GridStor, LLC.  Chris Taylor is domiciled in Portland, Oregon.  GridStor, LLC's other member is Goldman Sachs Asset Management, L.P., a Delaware limited partnership.  Goldman Sachs Asset Management, L.P. is directly held by GSAM Holdings LLC, a Delaware limited liability company.  GSAM Holdings LLC is a wholly-owned subsidiary of The Goldman Sachs Group Inc.  The Goldman Sachs Group Inc. is a Delaware corporation with its principal place of business located in New York, New York. Therefore, Cable Buyer is a citizen of Delaware, New York, and Oregon.

6.      Upon information and belief, Claremont Buyer is a Delaware limited liability. GridStor Subsidiary, LLC, a Delaware limited liability company, is the managing member of Claremont Buyer.  GridStor, LLC, a Delaware limited liability company, is the sole member of

-2-

GridStor Subsidiary, LLC.  Chris Taylor is the managing member of GridStor, LLC.  Chris Taylor is domiciled in Portland, Oregon.  GridStor, LLC's other member is Goldman Sachs Asset Management, L.P., a Delaware limited partnership.  Goldman Sachs Asset Management, L.P. is directly held by GSAM Holdings LLC, a Delaware limited liability company.  GSAM Holdings LLC is a wholly-owned subsidiary of The Goldman Sachs Group Inc.  The Goldman Sachs Group Inc. is a Delaware corporation with its principal place of business located in New York, New York. Therefore, Claremont Buyer is a citizen of Delaware, New York, and Oregon.

7.      Upon information and belief, SFS Buyer is a Delaware limited liability company. GridStor Subsidiary, LLC, a Delaware limited liability company, is the managing member of SFS Buyer.  GridStor, LLC, a Delaware limited liability company, is the sole member of GridStor Subsidiary, LLC.  Chris Taylor is the managing member of GridStor, LLC.  Chris Taylor is domiciled in Portland, Oregon.  GridStor, LLC's other member is Goldman Sachs Asset Management, L.P., a Delaware limited partnership.  Goldman Sachs Asset Management, L.P. is directly held by GSAM Holdings LLC, a Delaware limited liability company.  GSAM Holdings LLC is a wholly-owned subsidiary of The Goldman Sachs Group Inc.  The Goldman Sachs Group Inc. is a Delaware corporation with its principal place of business located in New York, New York. Therefore, SFS Buyer is a citizen of Delaware, New York, and Oregon.

8.      Upon information and belief, Upland Buyer is a Delaware limited liability company.  GridStor Subsidiary, LLC, a Delaware limited liability company, is the managing member of Upland Buyer.  GridStor, LLC, a Delaware limited liability company, is the sole member of GridStor Subsidiary, LLC.  Chris Taylor is the managing member of GridStor, LLC. Chris Taylor is domiciled in Portland, Oregon.  GridStor, LLC's other member is Goldman Sachs Asset Management, L.P., a Delaware limited partnership.  Goldman Sachs Asset Management,

L.P. is directly held by GSAM Holdings LLC, a Delaware limited liability company. GSAM Holdings LLC is a wholly-owned subsidiary of The Goldman Sachs Group Inc. The Goldman Sachs Group Inc. is a Delaware corporation with its principal place of business located in New York, New York. Therefore, Upland Buyer is a citizen of Delaware, New York, and Oregon.

9.     Upon information and belief, RC Buyer is a Delaware limited liability company. GridStor Subsidiary, LLC, a Delaware limited liability company, is the managing member of RC Buyer. GridStor, LLC, a Delaware limited liability company, is the sole member of GridStor Subsidiary, LLC. Chris Taylor is the managing member of GridStor, LLC. Chris Taylor is domiciled in Portland, Oregon. GridStor, LLC's other member is Goldman Sachs Asset Management, L.P., a Delaware limited partnership. Goldman Sachs Asset Management, L.P. is directly held by GSAM Holdings LLC, a Delaware limited liability company. GSAM Holdings LLC is a wholly-owned subsidiary of The Goldman Sachs Group Inc. The Goldman Sachs Group Inc. is a Delaware corporation with its principal place of business located in New York, New York. Therefore, RC Buyer is a citizen of Delaware, New York, and Oregon.

10.     This Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1332 because the amount in controversy is in excess of $75,000, exclusive of interests and costs, and there is complete diversity of citizenship between the parties.

11.     Venue is proper in this judicial district because Section 13.5 of the MIPAs provides, in pertinent part, that the parties expressly submitted to the jurisdiction of this Court to resolve any dispute arising out of the MIPAs.

## FACTUAL BACKGROUND

**A.     The Membership Interest Purchase Agreements**

12.     Upstream and SDIRA are the owners of special purpose entities that, in turn, own assets, properties and contract rights associated with the development, construction and operation of energy storage facilities.

13.     Defendants are all renewable energy project companies managed by GridStor, LLC ("GridStor").  GridStor develops, owns and operates battery energy storage facilities.

14.     On October 25, 2022, Upstream entered into a Membership Interest Purchase Agreement ("MIPA I") with Defendants Cable Buyer, Claremont Buyer, SFS Buyer and Upland Buyer through which those defendants agreed to purchase membership interests in the aforementioned special purpose entities, also known as project companies, owned by Upstream. Those project companies are:  SFS Energy Storage LLC ("SFS Project Company"), Cable Energy Storage LLC ("Cable Project Company"), Upland Reliability Project LLC ("Upland Project Company") and Claremont Reliability Project LLC ("Claremont Project Company).

15.     The projects associated with MIPA I (the "Projects I") include:  SFS Energy Storage 1 Project ("SFS1"), SFS Energy Storage 2 Project ("SFS2"), Cable Energy Storage Project ("Cable Storage Project"), Upland Reliability Project ("Upland Project") and Claremont Reliability Project ("Claremont Project").

16.     Similarly, and also on October 25, 2022, SDIRA entered into a Membership Interest Purchase Agreement ("MIPA II" and collectively with MIPA I, the "MIPAs") with Defendant RC Buyer through with that defendant agreed to purchase membership interests in RC Energy Storage LLC, which owned the assets, properties, and contract rights associated with RC Energy Storage Project ("RC Energy Project" and collectively with Projects I, the "Projects").

17.     Prior to executing the MIPAs, the parties and their third-party consultants engaged in a robust due diligence process wherein Plaintiffs afforded Defendants access to all necessary

documents to support the representations and warranties set forth in the MIPAs by Plaintiffs. Those documents included data and information in Plaintiffs' possession, custody and control related to the early-stage development of the energy storage facilities contemplated under the MIPAs.

18.     By way of example, as part of the due diligence process and initial closings for each of the membership interest purchases, Plaintiffs offered Defendants a development services agreement (the "Development Services Agreement") that would have allowed Plaintiffs to support Defendants as they proceeded with development of the energy storage projects (the "Projects").

19.     Defendants did not enter into the Development Services Agreement because they believed it was unnecessary.  Defendants contended that they were building an alleged "industry leading" storage independent power producer ("IPP") with all the alleged necessary skill and employees required to successfully develop the Projects.

20.     However, after closing the MIPAs and notwithstanding their refusal of the Development Services Agreement, Defendants repeatedly contacted Plaintiffs with questions related to the development of the Projects.  Defendants' questions sought guidance from Plaintiffs about how to execute and think about certain tasks related to the Projects' development. Defendants' questions continued all the way through February and March 2024.

21.     In good faith, Plaintiffs provided their view and advice to Defendants in connection with the aforementioned questions.

22.     Under Section 8.6 of the MIPAs, Defendants must provide Plaintiffs with either a written or oral progress report "summarizing the status of the development and construction of the

applicable Project and the estimated Commercial Operation Dates for such Project" upon written request of Plaintiffs.  *See* Exhibits 1 and 2.[1]

23.     On or about November 7, 2023, Plaintiffs requested a progress report from Defendants regarding the status of the Projects.

24.     On November 7, 2023, Defendants provided Plaintiffs with a written Projects' progress report for Q4 2023.

25.     Indeed, as of Q4 2023, Defendants indicated that all of the Projects were viable and proceeding towards Notice to Proceed (defined *supra*) dates.

26.     Defendants specifically indicated in that progress report that the projected Notice to Proceed date for the SFS1 project is July 31, 2025.  Defendants further indicated that the projected Notice to Proceed Dates would be as follows:  (i) May 31, 2026 for Upland; (ii) July 31, 2026 for Cable; (iii) August 31, 2026 for Claremont; (iv) October 30, 2026 for RC; and (v) October 31, 2027 for SFS2.

27.     Defendants also indicated in that progress report that the projected Commercial Operation Date (defined *supra*) for the SFS1 project is November 30, 2025.

28.     That Projects' status update did not mention any delays, unexpected costs or other issues related to the development of the Projects.

29.     Plaintiffs had many communications with Defendants since the execution of the MIPAs in which Defendants indicated that all the Projects would be completed.

30.     On or about February 9, 2024, Plaintiffs requested a progress report from Defendants regarding the status of the Projects.  Although Plaintiffs scheduled a call in order for

---

[1] Exhibits 1 and 2 are MIPA I and MIPA II, respectively.  The copies of the respective MIPAs at Exhibits 1 and 2 are only copies of the executed agreements themselves and do not contain annexes, schedules, exhibits, or other ancillary documents attached to the original MIPAs.

Defendants to deliver their progress report pursuant to Section 8.6 of the MIPAs, Defendants failed to appear for that call.

**B.      Milestone Payments**

31.      Section 2.2.3 of the MIPAs requires Defendants to pay Plaintiffs, "within ten (10) Business Days following the Notice to Proceed for a Project Company and its applicable Project, an amount equal to:  (A) ninety percent (90%) of (1) the Design Capacity for such Project *multiplied by* (2) the Development Fee *minus* (B) the Purchase Price paid to date."  *See* Exhibit 1 (emphasis included).

32.      Under Section 1.1 of the MIPAs, a Notice to Proceed means, in pertinent part:

[W]ith respect to the Project, the earlier to occur of either (a) the issuance of a full and complete notice to proceed to a third-party contractor to proceed with construction activities for the Project, (b) the delivery of ten percent (10%) of the battery storage systems to the Project site, or (c) the drawdown of funds under a third-party construction debt financing for the Project, where such funds are used for costs related to the procurement of equipment or construction activities for the Project.

*See* Exhibits 1 and 2.

33.      The payment described in Section 2.2.3 of the MIPAs is referred to as an NTP Payment.

34.      Section 2.2.4 of the MIPAs requires Defendants to pay Plaintiffs, "within ten (10) Business Days after the Commercial Operation Date for a Project Company and its applicable Project, an amount equal to:  (A) the product of (1) the Interconnection Capacity for such Project, *multiplied by* (2) the Development Fee, *minus* (B) the Purchase Price paid to date."  *See* Exhibit 1 (emphasis included).

35.      Under Section 1.1 of the MIPAs, the Commercial Operation means, in pertinent part:

> [W]ith respect to the Project or an Expansion Project, the date on which the Project or such Expansion Project has been interconnected with the Transmission Service Provider, has achieved substantial completion and completed its commissioning testing and, following the commencement of daily or regular operations, is charging, storing and discharging electricity on a commercial basis.

*See* Exhibits 1 and 2.

36.     Under Section 1.1 of the MIPAs, Commercial Operation Date means, in pertinent part: "with respect to the Project or an Expansion Project, the date on which Commercial Operation occurs for the Project or such Expansion Project." *See* Exhibits 1 and 2.

37.     The payment described in Section 2.2.4 of the MIPAs is referred to as a COD Payment.

38.     On or about April 4, 2024, Defendants indicated that, although SFS1 was on pace to receive a Notice to Proceed and to be commercially operational by 2025, Defendants did not intend to make the NTP or COD Payments.

39.     The NTP and COD Payments for each Project combined are valued at approximately $92 million under Sections 2.2.3 and 2.2.4 of MIPA I.

**C.     Purported Indemnity Notice**

40.     Section 1.1 of the MIPAs defines Indemnity Notice as a "written notification . . . of a claim for indemnity . . . by an Indemnified Party, *specifying the nature of and basis for such claim*, together with *the amount or, if not then reasonably determinable, the estimated amount of the Loss arising from such claim*." *See* Exhibits 1 and 2 (emphasis added).

41.     Section 9.2 of the MIPAs provides for indemnification in the event of various types of claims asserted against the parties to the MIPAs. Section 9.3.2 of the MIPAs provides:

> If any Indemnified Party should have a claim under Section 9.2 against any Indemnifying Party that does not involve a Third Party Claim, the Indemnified Party shall deliver an Indemnity Notice with reasonable promptness to the Indemnifying Party. If the Indemnifying Party notifies the Indemnified Party that

it does not dispute the claim described in such Indemnity Notice or fails to notify the Indemnified Party within the Dispute Period whether the Indemnifying Party disputes the claim described in such Indemnity Notice, the Loss arising from the claim specified in such Indemnity Notice shall be conclusively deemed a liability of the Indemnifying Party under Section 9.2 and the Indemnifying Party shall pay the amount of such Loss to the Indemnified Party on demand following the final determination thereof.  If the Indemnifying Party disputes the claim described in the Indemnity Notice, the Indemnified Party may proceed to take any and all actions available to it in law or equity to recover any amounts due to it pursuant to this ARTICLE 9.

42.     On April 22, 2024, Defendants served a letter on Plaintiffs purporting to be an Indemnity Notice under the MIPAs.  *See* Exhibit 3 (Purported Indemnity Notice).  The Purported Indemnity Notice purported to assert claims that did not involve any Third Party Claim.

43.     In the Purported Indemnity Notice, Defendants contended vaguely that the Projects were "facing . . . delays and increased costs relating to interconnection and other challenges."

44.     Defendants further contended in the Purported Indemnity Notice that Plaintiffs breached representations set forth in Sections 5.14, 5.23 and 5.25 of the MIPAs.

45.     However, Defendants did not "specify" in the Purported Indemnity Notice "the nature of or basis for" the purported breach of representations set forth in Sections 5.14, 5.23 and 5.25 of the MIPAs beyond the vague assertion that Projects were "facing . . . delays and increased costs relating to interconnection and other challenges."

46.     Defendants also did not include in the Purported Indemnity Notice "the amount or, if not then reasonably determinable, the estimated amount of the Loss arising from such claim."

47.     Section 9.3.2 of the MIPAs clearly contemplates that an Indemnity Notice served in accordance with the definition set forth in Section 1.1 must contain sufficient specificity in terms of both the nature of and basis for the purported claim and the amount of the Loss arising from such claim to allow the responding party to fairly dispute the claim and consider whether to permit

Case 1:24-cv-03896   Document 1   Filed 05/20/24   Page 11 of 16


the amount of the Loss set forth therein to be "conclusively deemed a liability of the Indemnifying Party."

48.     On May 20, 2024, Plaintiffs delivered a notice within the Dispute Period to Defendants that, *inter alia*, disputed the claims described (albeit vaguely) in the Purported Indemnity Notice.

49.     Under Section 9.1 of the MIPAs, the survival period for claims arising from alleged breaches of Section 5.14, 5.23 and 5.25 of the MIPAs expires eighteen (18) months following the Closing Date.

50.     The Closing Date of the MIPAs was October 25, 2023.  Accordingly, the survival period for claims arising from alleged breaches of Section 5.14, 5.23 and 5.25 of the MIPAs expired on April 25, 2024.

<u>**COUNT I:**</u>
**Declaratory Judgment as to All Defendants**

51.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 50 as though fully set forth herein.

52.     By virtue of Defendants serving a Purported Indemnity Notice on Plaintiffs, a justiciable controversy exists concerning, among other things, the enforceability of that Purported Indemnity Notice.

53.     Defendants' Purported Indemnity Notice asserts of breaches by Plaintiffs of the MIPAs and seeks an undetermined amount of damages.

54.     In the absence of a timely resolution of this dispute, Defendants will continue to seek to enforce a Purported Indemnity Notice that fails to "specify the nature of or basis for" Defendants' claim and fails to specify "the amount or, if not then reasonably determinable, the estimated amount of the Loss arising from such claim."

55.     Therefore, in order to resolve their controversy with Defendants, Plaintiffs seek a declaration that, under the plain terms of the MIPAs, the Purported Indemnity Notice is insufficient and thus unenforceable as an Indemnity Notice under the MIPAs.

56.     Plaintiffs seek a further declaration that, under the plain terms of the MIPAs, the survival period for claims arising from alleged breaches of Section 5.14, 5.23 and 5.25 of the MIPAs has now expired and that Defendants are no longer permitted under the MIPAs to assert claims against Plaintiffs arising from alleged breaches of Section 5.14, 5.23 and 5.25 of the MIPAs.

<u>COUNT II:</u>
**Declaratory Judgment as to All Defendants**

57.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 56 as though fully set forth herein.

58.     Alternatively, assuming *arguendo* that the Purported Indemnity Notice is deemed to be sufficient and thus enforceable as an Indemnity Notice under the MIPAs, pursuant to Section 9.3.2 of the MIPAs Plaintiffs dispute the claims described (albeit vaguely) in the Purported Indemnity Notice.

59.     Plaintiffs did not breach Sections 5.14, 5.23 and/or 5.25 of the MIPAs.  Indeed, Defendants' failure to "specify the . . . basis for" the claims described in the Purported Indemnity Notice constitutes an admission by Defendants that there is no basis for such claims.

60.     Any "delays and increased costs relating to interconnection and other challenges" experienced by Defendants with respect to the Projects were not caused by any breach, action or inaction of Plaintiffs.  Rather, any "delays and increased costs relating to interconnection and other challenges," to the extent caused by anyone, were caused by Defendants' own mismanagement of the Projects in the year-and-a-half following the closing of the sale of the Projects.

61.     In order to resolve their controversy with Defendants, Plaintiffs seek a declaration that Plaintiffs are not liable to indemnify Defendants for any Loss arising from claims described in the Purported Indemnity Notice.

62.     Pursuant to Sections 1.1, 9.2 and 9.3.2 of the MIPAs, the amount for which an indemnified party is entitled to be indemnified by an indemnifying party is prescribed by "the amount or, if not then reasonably determinable, the estimated amount of the Loss arising from such claim." Here, Defendants identified no "amount or . . . estimated amount of the Loss arising from" any claims described in the Purported Indemnity Notice.

63.     In order to resolve their controversy with Defendants, Plaintiffs seek a further declaration that the amount of indemnifiable Loss arising from any claims described in the Purported Indemnity Notice is zero.

## COUNT III:
### Breach of Contract as to All Defendants

64.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 63 as though fully set forth herein.

65.     Section 9.3.2 of the MIPAs imposed a contractual duty on Defendants, if they chose to pursue indemnity rights under Section 9.2 of the MIPAs, to deliver an Indemnity Notice that complied with the requirements of Section 1.1 of the MIPAs.

66.     Defendants' delivery of the Purported Indemnity Notice did not comply with the requirements of Section 1.1 of the MIPAs, and thus constituted a breach of the MIPAs.

## COUNT IV:
### Anticipatory Breach of Contract as to All Defendants

67.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 66 as though fully set forth herein.

-13-

68.     Plaintiffs and Defendants, *inter alia*, entered into MIPA I and MIPA II, respectively, whereby Defendants agreed to make NTP Payment and COD Payments to Upstream pursuant to Sections 2.2.3 and 2.2.4 of the MIPAs, respectively.

69.     Section 2.2.3 of the MIPAs requires Defendants to make the NTP Payments to Plaintiffs following the issuance of the Notice to Proceed.

70.     Section 2.2.4 of the MIPAs requires Defendants to make the COD Payments to Defendants once the Projects are commercially operational.

71.     On November 7, 2023, SFS Buyer informed Upstream that the SFS1 project would be completed and operational in 2025.

72.     On November 7, 2023, Upland Buyer, Cable Buyer, Claremont Buyer and RC Buyer each informed Plaintiffs that their respective projects would be completed and operational by 2026.

73.     On that same date, SFS2 Buyer informed Upstream that its project would be completed and operational by 2027.

74.     However, on or about April 4, 2024, SFS Buyer informed Plaintiffs that SFS Buyer did not intend to make the NTP or COD Payments to Upstream once the SFS1 project was complete.

75.     Defendants further informed Plaintiffs that Defendants did not intend to make NTP or COD Payments to Plaintiffs on the remaining Projects.

76.     The combined value of the NTP and COD Payments for all Projects is approximately $92 million.

77.     Due to Defendants' expressed intent not make any NTP and COD Payments, Plaintiffs are entitled to payment of $12.825 million under Sections 2.2.3 and 2.2.4 of MIPA I as

relates to SFS Buyer and additional amounts to be determined at trial in connection with Defendants' refusal to make such payments in connection with the remaining Projects, plus all reasonable attorneys' fees and all costs relating to the prosecution of this action pursuant to Article 9 of the MIPAs.

WHEREFORE, Plaintiffs pray for judgement against Defendants as follows:

A.     A judgment declaring that (i) Defendants' Purported Indemnity Notice is insufficient under the MIPA, and thus unenforceable as an Indemnity Notice under the MIPAs and (ii) the survival period for claims arising from alleged breaches of Section 5.14, 5.23 and 5.25 of the MIPAs has now expired and that Defendants are no longer permitted under the MIPAs to assert claims against Plaintiffs arising from alleged breaches of Section 5.14, 5.23 and 5.25 of the MIPAs;

B.     Alternatively, a judgment declaring that (i) Plaintiffs are not liable to indemnify Defendants for any claims described in the Purported Indemnity Notice and/or (ii) the amount of indemnifiable Loss arising from any claims described in the Purported Indemnity Notice is zero;

C.     Awarding Plaintiffs compensatory damages caused by Defendants' delivery of the Purported Indemnity Notice in breach of the MIPAs, in an amount to be determined at trial;

D.     Awarding Plaintiffs $92 million in compensatory damages for Defendants' failure to remit the milestone payments associated with the Projects;

E.     Awarding Plaintiffs interest, attorneys' fees and costs pursuant to Section 9.2.2 of the MIPAs, and

F.      Awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated: New York, New York          Respectfully submitted,
       May 20, 2024

                                   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

                                   By:   */s/ John P. Stigi III*
                                         _____
                                         John P. Stigi III
                                         Damani C. Sims
                                         30 Rockefeller Plaza, 30th Floor
                                         New York, New York 10112
                                         Tel. (212) 653-8700
                                         Fax (212) 653-8701
                                         jstigi@sheppardmullin.com
                                         dsims@sheppardmullin.com

                                         *Attorneys for Plaintiffs Upstream Renewable Dev II LLC*
                                         *and Renewable SDIRA LLC*